WALTER MORGAN *v.* HENRY C. WHITE,
COMMISSIONER OF WELFARE

HOUSE, C. J., LOISELLE, MACDONALD, BOGDANSKI and LONGO, Js.

Argued January 10—decision released April 15, 1975

*Michael A. Arcari,* assistant attorney general, with whom were *Paige J. Everin,* assistant attorney general, and, on the brief, *Carl R. Ajello,* attorney general, for the appellant (defendant).

*Francis X. Dineen* and, of the Colorado bar, *Charles D. Calvin,* for the appellee (plaintiff).

MacDonald, J. This appeal by the defendant, the commissioner of welfare, hereinafter commissioner, from a judgment rendered by the Appellate Division of the Court of Common Pleas had its origin in the denial by the commissioner's hearing officer of the plaintiff's application for state medical assistance. The plaintiff, Walter Morgan, applied for medical assistance under what is commonly referred to as the "Medicaid" program administered by the state welfare department under §§ 17-134a—17-134*l* of the

General Statutes.[1] His eligibility to participate in the program having been denied by a caseworker, and having also been denied by a hearing officer after a statutory fair hearing, the plaintiff appealed to the Circuit Court under the then provisions of § 17-2b.[2] The Circuit Court rendered judgment dismissing the plaintiff's appeal, whereupon the plaintiff sought review in the Appellate Division of the Court of Common Pleas which reversed the judgment of the Circuit Court and remanded the case with direction to sustain the plaintiff's appeal. Counsel entered into a stipulation to include as part of the record in this appeal the transcript of the fair hearing, the exhibits presented therein, and the finding of the fair hearing officer, hereinafter FHO.

---

[1] "[General Statutes] Sec. 17-134a. ACCEPTANCE OF FEDERAL GRANTS FOR MEDICAL ASSISTANCE. The welfare commissioner is authorized to take advantage of the medical assistance programs provided in Title XIX, entitled 'Grants to States for Medical Assistance Programs,' contained in the Social Security Amendments of 1965 and may administer the same in accordance with the requirements provided therein, including the waiving, with respect to the amount paid for medical care, of provisions concerning recovery from beneficiaries or their estates, charges and recoveries against legally liable relatives, and liens against property of beneficiaries."

[2] "[General Statutes] Sec. 17-2b. DECISION. APPEAL. (a) Not later than thirty days after such hearing, the commissioner or his designated hearing officer shall render a final decision based upon all the evidence introduced before him and applying all pertinent provisions of law, regulations and departmental policy, and such final decision shall supersede the decision made without a hearing. Notice of such final decision shall be given to the aggrieved person by mailing him a copy thereof within seventy-two hours of its rendition. Such decision after hearing shall be final except that the applicant for such hearing, if aggrieved, may appeal therefrom, within thirty days from the date of its rendition, to the circuit court in any circuit in the county wherein he resides, in accordance with the provisions of subsection (b) of this section. No appeal may be taken from a decision made without a hearing. (b) Upon appeal to the circuit court from the decision made after hearing, the appellant shall state his reasons for appeal. Such

The relevant facts, drawn mainly from the fair hearing transcript,[3] hereinafter FHT, which is not inconsistent with the synopsis of the evidence as printed in an appendix to the plaintiff's brief, are as follows: The plaintiff, who at the time of the hearing was a patient at Park Manor Convalescent Hospital in Waterbury, applied for medical assistance under the provisions of §§ 17-134a through 17-134l. As previously indicated, the medical assistance program consists of the administration by the commissioner of the federal medical aid program provided in Title XIX of the Social Security Amendments of 1965; 42 U.S.C. §§ 1396–1396i; commonly referred to as Medicaid. The plaintiff's application was filed on February 2, 1971, and denied on March

appeal shall be made returnable to said court in the same manner as that prescribed for civil actions brought to said court. Notice of such appeal shall be given by leaving a true and attested copy thereof with the welfare commissioner or by sending the same to him by registered or certified mail. Upon receipt of such copy, the welfare commissioner shall certify to the court a transcript of the hearing record, together with a copy of tne hearing decision, and shall forward to the appellant a copy of the transcript of the hearing record. The findings of the commissioner or his designated hearing officer as to the facts, if supported by substantial and competent evidence, shall be conclusive. The court, upon such appeal, shall determine whether the commissioner has acted illegally or so arbitrarily and unreasonably as to abuse his discretion, and said court, in accordance with such determination, may reverse or affirm, wholly or partly, or may modify or revise the decision appealed from. Costs shall not be allowed against said commissioner. Appeals from decisions of said commissioner shall be privileged cases to be heard by the court as soon after the return day as shall be practicable."

[3] The fair hearing was held on June 4, 1971, but was not fully transcribed owing to mechanical failure of the recording device employed for that purpose; that hearing resulted in a ruling adverse to the plaintiff, but owing to the failure of the transcriber no record was available. A rehearing was scheduled for September 8, 1971, solely for the purpose of creating a proper record for the plaintiff's appeal to the Circuit Court.

24, 1971, by a caseworker solely on the ground of the plaintiff's purported disposal of assets without fair value, in that, in October, 1969, the plaintiff had quitclaimed his interest, valued at $10,000, in his East Haven home to his daughter in consideration of her having lived with the plaintiff and having provided him with nursing care from July, 1966, to the spring of 1969. At the time of the filing of his application the plaintiff received a monthly pension in the amount of $192, and his wife was employed and had gross weekly earnings of $105.[4]

In 1966 the plaintiff and his family determined that he needed professional assistance to care for him on a daily basis since he was suffering from multiple sclerosis. In-home professional care was financially impractical. Marilyn A. Felsted, the plaintiff's daughter, in 1963, had purchased property on which she had planned to build a home to accommodate herself and her parents. In 1966 the plaintiff's condition worsened and immediate action became necessary. The construction of her house not having yet been commenced, Mrs. Felsted thereupon entered into an oral agreement with the plaintiff whereby she would sell her property and the

---

[4] It was not determined by the caseworker that the combined monthly income of the Morgans rendered the plaintiff ineligible for medical assistance. The FHO, however, considered ineligibility also on the basis of income and stated in her finding that without offsetting medical costs the income of the Morgans would exceed the maximum monthly support allowance detailed by the regulations of the welfare department in effect at that time. See 1 Conn. Welfare Manual § 344.2. The fair hearing was conducted solely to determine the correctness of the caseworker's ruling with regard to the disposal of assets, and the parties presented no evidence with regard to the plaintiff's ineligibility by reason of excessive income. In determining the validity of the agency action, the FHO should have confined herself to the stated basis for that action.

Morgans would sell their home. Together, with the proceeds of the two sales, they would purchase a house large enough to accommodate both Mrs. Felsted's family and the Morgans. Accordingly, in June, 1966, the Morgans and Mrs. Felsted purchased a house located at 600 Thompson Street in East Haven. The Morgans and Mrs. Felsted each contributed $10,000 toward the down payment on the purchase price, which was $33,000. Mrs. Felsted and her husband obtained a mortgage for $13,000 to cover the balance of the purchase price and assumed the payment of that note and all maintenance costs for the home.

The Felsteds then invested $2500 in remodeling the house to accommodate the two families. Under the oral agreement, Mrs. Felsted was to give up her full time employment as a nurse, in which she earned $105 weekly, in order to provide full time nursing care for her father. The parties agreed to value her services at $60 per week and further agreed that when the accrued value of her services approximated the amount of the Morgans' share of the down payment on the Thompson Street property, the Morgans would convey their interest in the property to Mrs. Felsted. Originally, title to the property was recorded only in the names of the Morgans for the reason that the parties apparently feared that should any of Mrs. Felsted's six stepchildren become involved in tortious conduct it might mean the loss of the house. The Morgans had once been the victims of a large civil suit and this was given as the reason for their apprehension. In October, 1969, the property was quitclaimed to Mrs. Felsted, the parties being satisfied that the accrued value of Mrs. Felsted's services to that date provided

adequate consideration for the transfer. At that time the parties did not anticipate that the plaintiff would ever apply for welfare assistance.

As previously indicated, the record clearly shows that the application for medical assistance originally was denied solely on the basis of the conclusion of the caseworker that reasonable consideration had not been given for the transfer of the property. The FHO in her memorandum cited § 17-109 of the General Statutes[5] and volume 1, Connecticut Welfare Manual §§ 326 and 326.1,[6] in concluding that the execution of the oral agreement was not fair value or reasonable consideration for the transfer. The Appellate Division of the Court of Common Pleas held that the executed oral agreement did constitute

---

[5] "[General Statutes] Sec. 17-109. ELIGIBILITY. Any person shall be eligible for an old age assistance award who . . . (e) has not made an assignment or transfer or other disposition of property without reasonable consideration . . . ."

[6] Section 326 in part provides:

"326   *Property Transfer*

    A. *Prior to Application*

        The determination of eligibility shall include an examination of the past and present property holdings of the applicant and of any family member whose needs are to be included in the assistance plan, to determine that resources have not been disposed of for the purpose of qualifying for assistance or without the receipt of fair value.

      .      .      .      .      .

        The following are the more usual means by which property may have been transferred:

        1. Deeding real estate to relatives . . . ."

Section 326.1 in part provides:

"326.1 *Fair Value Received—Applications*

        When an applicant has transferred property to another owner, eligibility may be found if facts relating to the

sufficient consideration for the transfer and that the conflicting sections in the manual must give way to this conclusion.[7]

Section 17-134a of the General Statutes provides that the commissioner is to administer the Title XIX program "in accordance with the requirements provided therein." Section 17-134e states: "All of the provisions of this chapter are extended to the medical assistance program except such provisions as are inconsistent with federal law and regulations governing Title XIX of the Social Security Amendments of 1965 and this part." Thus, the legislature recognized the primacy of the applicable federal provisions and this court must be guided by those

---

transfer can be substantiated, showing that fair value or reasonable consideration was received.

. . . . .

The more usual forms in which fair value is received are:

1. Cash
2. Mortgage note
3. Support, provided either in cash or in kind, subsequent to date of transfer
4. Receipt for payment of a valid loan or other debt secured by note or deed

*Support*

When fair value has been received in the form of support, the value of such support shall be computed in accordance with the Department's Cost of Living Scale for Legally Liable Relatives. . . . Such support is computed from the date of transfer and other income and resources available are taken into consideration. . . ."

[7] The Appellate Division also held that insofar as § 17-82c is a part of chapter 302 of the General Statutes dealing with the medical assistance program, it is inconsistent by virtue of § 17-134e with the pertinent federal statutes and regulations. The court decided this issue although the parties did not raise it. It bears no relevance to our determination of the issues in the present case and thus we give no consideration to this portion of the judgment of the Appellate Division.

provisions. Stated in another way, the federal statutes and regulations set a limit upon the authority of the commissioner as well as furnishing a guide to his administration of the program. This limitation would apply, with particular force, to the eligibility requirements, and thus, where the state sets stricter standards for eligibility than those enumerated by the pertinent federal law, the state standards are tacitly inconsistent with those federal provisions.

Section 1396a of 42 U.S.C. states in pertinent part: "A State plan for medical assistance must . . . (17) include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which (A) are consistent with the objectives of this subchapter, (B) provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, available to the applicant or recipient and . . . as would not be disregarded . . . in determining his eligibility for such aid, assistance, or benefits, (C) provide for reasonable evaluation of any such income or resources." Section 1396a further states in subsection (19) that the state plan must "provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients."

The federal regulations presently applicable, 45 C.F.R. § 248.21 (1974), provide the following with regard to financial eligibility for medical assistance programs: "(a) State plan requirements. A State

plan under Title XIX of the Social Security Act must: . . . (2) . . . (i) Provide that only such income and resources as are *actually available* will be considered and that income and resources will be reasonably evaluated; . . . (3) . . . (iv) Provide that only such income and resources will be considered as will be 'in hand' within a period, preferably of not more than 3 months, but not in excess of 6 months, ahead, including the month in which medical services were rendered, for which payment would be made under the plan." (Emphasis added.)

The federal statutes and regulations were fully discussed in their relation to the state administration of Title XIX in *Wilczynski* v. *Harder,* 323 F. Sup. 509 (D. Conn.). The court there distinguished the eligibility requirements under the four state categorical assistance programs—dependent children, aged, blind, and disabled—from eligibility requirements for participation in the Title XIX program, and found that, despite ineligibility for state relief under the four enumerated programs, those persons satisfying Title XIX requirements would be eligible for Medicaid benefits. Id., 514, 515. The court found three classes of eligible recipients for Title XIX. The first class consists of those receiving aid under any one of the four categorical assistance programs. The second class consists of those persons who would be eligible for aid under one of the categorical assistance programs but for state eligibility requirements applicable to those programs which are at the same time specifically prohibited as eligibility requirements for Title XIX. These first two classes are referred to as the "categorically needy." The third class, referred to as the "medically needy," consists of those who are related to the categorical programs, that is, by being

old, or disabled, or blind or by having dependent children, but whose income "and/or" assets exceed the eligibility limits of the appropriate category but are insufficient to pay for their medical care. *Wilczynski* v. *Harder,* supra, 515.

Where § 17-134e incorporates the other provisions of chapter 302 not inconsistent with federal law, the incorporation creates the classes referred to in *Wilczynski.* The use by the FHO of § 17-109 (e) as an outright bar to eligibility disregards the distinctions enumerated in *Wilczynski.* Even if we assume the correctness of the FHO's conclusion concerning eligibility under § 17-109 (e), this conclusion would merely render the plaintiff ineligible for the particular state categorical programs to which § 17-109 applies, that is, assistance to the aged, blind and disabled. It would not create an automatic ineligibility for Title XIX relief. The commissioner had the responsibility, before denying Title XIX relief, to determine whether the plaintiff was eligible as a member of either the second or third class discussed in *Wilczynski.* No such determination was made.

In addition, we cannot find that, in the first instance, the FHO correctly concluded that § 17-109 (e) barred the plaintiff. The issue of the enforceability of this type of oral contract, involving a similar family arrangement, has previously been decided by this court. In *Padula* v. *Padula,* 138 Conn. 102, 82 A.2d 362, the facts of which are relevant to our consideration here, Liberto Padula agreed to live with his father-in-law, Amarose, on his (Amarose's) farm and to care for both the property and Amarose. Liberto constructed a new farm building and, at his own expense, made extensive

repairs and improvements. Amarose had orally agreed that if Liberto would live with him and care for him and the property, he would give Liberto the farm. For a period of thirty years Liberto fulfilled his part of the agreement. Amarose, however, conveyed the farm to Liberto's sons by reason of some claimed undue influence on their part, and Liberto sought to set aside this conveyance. The trial court sustained demurrers to his complaint, two of the issues raised being that the oral contract violated the Statute of Frauds and that the contract was not founded upon valuable consideration. In reversing the trial court, this court ruled that performance by Liberto was sufficient to remove the contract from the Statute of Frauds. As to the question of consideration the court stated (p. 109) : "The defendants' contention, concerning Liberto's cause of action, that the contract was not equal, just and fair and founded upon a valuable consideration is without merit. The consideration alleged is Liberto's agreement to live on the farm and take care of it and of Amarose during the latter's life. That not only is legal consideration for the contract but also is adequate to justify enforcement of the agreement in equity."

Similarly, in the case before us, the performance by Mrs. Felsted of her duties under the oral agreement was sufficient to render the agreement an enforceable contract and, further, constituted reasonable consideration. Even more compelling than the situation in *Padula* is the fact that, having placed a specific value upon her services, the Morgans conveyed their interest at the time that the accrued value of Mrs. Felsted's services approximated the value of that interest.

The restrictions of § 326.1 of volume 1 of the Connecticut Welfare Manual, that only support rendered subsequent to the date of transfer constitutes consideration and that receipt for payment of a debt must be secured by note or deed, are too strict, and, as has been demonstrated, conflict with this court's decision in *Padula*. Within the grant of authority allowing judicial review of such agency action exists the authority to review the propriety of the standards relied upon by the commissioner in effecting his delegated duties. *General Motors Corporation* v. *Mulquin*, 134 Conn. 118, 131, 55 A.2d 732. We have, in various contexts, reviewed administrative regulations to determine whether they are within the purview of the enabling act and whether the criteria contained in such regulations are as reasonably precise as the subject-matter requires and are reasonably adequate and sufficient to guide the agency and to enable those affected to know their rights and obligations. *Forest Construction Co.* v. *Planning & Zoning Commission*, 155 Conn. 669, 679, 680, 236 A.2d 917. As we stated in *Forest Construction* (p. 679): "It is unrealistic to demand detailed standards which are impracticable or impossible. . . . As the complexity of economic and governmental conditions increases, the modern tendency is liberal in approving broad regulatory standards so as to facilitate the operational functions of administrative boards or commissions."

Section 17-109 (e) of the General Statutes and § D-244.11 of volume 1 of the Connecticut Welfare Manual, which is, in essence, a paraphrasing of § 17-109 (e), furnish guidelines necessary to a cautious determination of eligibility to insulate the assistance programs from fraudulent transfers, but they must be applied in a manner consistent with

the language and purpose of the federal statutes and regulations. Such standards are necessary for the efficient and equitable operation of these programs, but they must be sufficiently elastic to incorporate correct legal principles and recognize the realities of the varying practical situations of applicants. Adherence to standards grounded upon a misconception of applicable legal principles only serves to reinforce the growing public perception of such agencies and their operatives as mired in counterproductive pedantries. The commissioner has mistaken the law and thus has acted illegally. *Dempsey* v. *Tynan,* 143 Conn. 202, 206, 120 A.2d 700.

The execution of the oral agreement by the Morgans and Mrs. Felsted rendered it enforceable, and the rendition of valuable services by Mrs. Felsted to the plaintiff in reliance on the promise to recompense her by transferring to her the property at such time as the accrued value of her services approximated the value of their interest, despite language in § 326.1 to the contrary, constituted reasonable consideration under § 17-109 (e) and §§ 326 and D-244.11.

There is no error.

In this opinion the other judges concurred.